## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| JENNY EBERLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 4:05-cv-0030 |
| | ) | |
| THE PRUDENTIAL INSURANCE | ) | |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on: (1) "Defendant's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(b) or, in the Alternative, Judgment Pursuant to Fed. R. Civ. P. 52," filed by Defendant, The Prudential Insurance Company of America, on October 5, 2006; and (2) "Request for Oral Argument," filed by Plaintiff, Jenny Eberle, on November 6, 2006. For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.** The motion is **GRANTED** as to Plaintiff's claim for breach of the covenant of good faith and fair dealing, and the Clerk is **ORDERED** to dismiss that claim **WITH PREJUDICE.** The motion is **DENIED** as to Plaintiff's claim for breach of contract, and that claim **REMAINS PENDING.** Plaintiff's request for oral argument is **DENIED AS MOOT.**

1

BACKGROUND

Procedural Background

This controversy stems from Plaintiff, Jenny Eberle's pursuit of long term disability ("LTD") benefits under an employee welfare benefit plan maintained and sponsored by her previous employer, Purdue University ("Purdue"), with LTD benefits underwritten by Defendant, The Prudential Insurance Company of America ("Prudential"). On May 10, 2005, Eberle filed this lawsuit against Prudential sounding in breach of contract and breach of the covenant of good faith and fair dealing. Prudential filed an amended answer on September 26, 2006, setting forth its affirmative defenses and a counterclaim against Eberle for common law fraud and misrepresentation.

Prudential claims that it made the proper decision to terminate Eberle's claim for benefits, and that her breach of contract claim must fail, because: (1) Eberle's complaints of brittle diabetes and cognitive impairment were not supported by clinical and diagnostic evidence available to Prudential when it made the determination to terminate benefits; and (2) Eberle's treating physicians based their opinions that Eberle could not perform her job solely based upon Eberle's reports, on an incomplete understanding of Eberle's job, and on Eberle's ability to perform a full time position. Prudential also argues that it is

entitled to summary judgment on Eberle's breach of the covenant of good faith and fair dealing claim because Eberle lacks standing, and because Prudential acted reasonably in denying Eberle's claim.

In response, Eberle claims that she presented overwhelming evidence from four doctors that supported her claim for benefits and that Prudential had no legitimate basis to deny her claim. As a result, Eberle argues that under Indiana law, Prudential breached the disability policy as well as the covenant of good faith and fair dealing. Having been fully briefed, this motion is now ripe for adjudication.

<u>Undisputed Factual Background</u>

Both parties have submitted lengthy factual submissions. The Court will attempt to set forth the undisputed material factual background. Eberle started working for Purdue in September of 1978. During her years of employment, she received several promotions and her last position was an Account Manager for the Departments of Education and Fellowships. At some point during her employment, Eberle requested to work half-time, and Purdue granted that request. Some time in the late 1990's, there was a growing need to have full-time staff available and Purdue was unable to maintain the half-time position. The parties reached a compromise and Eberle worked a three-quarter time position. Eberle stopped working on November 11, 2003.

Eberle participated in Purdue's employee welfare benefit plan, initially maintained and self-insured by Purdue, with administrative services provided by Liberty Mutual Assurance Company. Effective January 1, 2004, Purdue changed the funding of its LTD program from self-insured to fully-insured. Prudential provided pricing for all open self-insured LTD claims under the Purdue employee welfare benefit plan, incurred prior to January 1, 2004, and purchased the liability from Purdue by a reserve buy-out, effective January 1, 2004. Prudential administers the claims pursuant to the terms of the previous Administrative Services Only Agreement (hereinafter the "Policy") Purdue had entered into with Liberty Mutual Assurance Company.

In April 2004, Prudential received Eberle's claim for LTD benefits. Along with the claim, Eberle submitted an attending physician's statement signed by endocrinologist, Dr. Meletios Karas, and a lab print out. Alycea Tetto, a Disability Claims Manager at Prudential, reviewed Eberle's claim and conducted a telephone conference with Eberle, who reported diabetic complications and cognitive impairment. Tetto found the information submitted by Eberle sufficiently supported the claim, and she approved Eberle's application for LTD benefits. Prudential approved Eberle's claim for benefits on June 10, 2004, with an effective date of May 9, 2004. Prudential began paying Eberle $1,828.12 in monthly benefits.

4

Shortly after Eberle's claim was approved, Tetto's involvement with the claim ended and a new claims examiner, Michelle Carr, handled Eberle's claim.   In August 2004, Mary Ann deSantis, RN, conducted a clinical review of Eberle's medical records, and Prudential gathered records to document Eberle's file. Carr and DeSantis met in person to discuss Eberle's claim, and Carr decided that same day to terminate Eberle's LTD benefits.   Prudential terminated Eberle's disability benefits effective November 1, 2004. Prudential sent a letter to Eberle on October 4, 2004, terminating her benefits for the following reasons:

> We reviewed medical information from your physician's [sic.], Dr. Karras [sic.], Dr. Clark and Dr. Shook.  Your primary care physician, Dr. Clark supplied us with your most recent office visit note dated January 19, 2004.  We contacted Dr. Clarks [sic.] office on August 2, 2004, at which time it was confirmed that this was the most recent office visit and no pending office visits had been scheduled.  In reviewing the information in this note, your physical exam findings were unremarkable and there was no documentation of foot ulcers or neuropathy.
>
> In addition to your primary care physicians office visit note, your Endocrinologist, Dr. Karas also provided his most recent information dated February 10 and 23, 2004.  Again, we contacted Dr. Karas' office who confirmed that this was your most recent office visit, with no upcoming appointments scheduled.  The February 22, 2004 office visit note documented no retinal diabetic neuropathy, no symptoms of neuropathy or nephropathy.  It was documented that you had callus' [sic.] on both feet, however, no ulcers were noted and your lungs were clear.  A review of your labs showed normal liver function, elevated HgA1C of 8.8 (4.7-6.4 range) and a glucose level of 47.  However, this reading would not be expected to impair you from

performing your own occupation, which the employer
statement lists as sedentary, working thirty hours
weekly since 1989.

Finally, we reviewed office visit notes from your
psychologist, Dr. Shook.  This included your two
most recent office visit notes from November of
2003 and April 13, 2004.  However, these records do
not appear to document any impairment, either
cognitive, vegetative, psychotic or a social
dysfunction.  As of your April 13, 2004 visit, it
is indicated that you are on the school board and
your daughters prom committee, you teach bible
school and produce a bulletin for your church.

Based upon the medical information gathered, there
is no documentation to support an impairment that
would preclude you from performing the essential
functions of your own, sedentary occupation.
Further, the intensity or frequency of treatment
which would be expected is not evident in these
medical records.

(108-09.)[1]

Eberle submitted a request for reconsideration on September
30, 2004, and in a telephone conference with Prudential, stated she
would submit additional medical documentation for Prudential's
review.  Prudential received a letter of medical advocacy from Dr.
Nancy Shook, a psychologist, stating that "Eberle's medical and
mental conditions prevent[] her from obtaining gainful employment
and she is entitled to long-term disability benefits." (422.)  Dr.
William K. Oliver III, Eberle's podiatrist, sent medical records to

---

[1]Prudential's claim file is bates stamped numbers 1 through
482.

Prudential, indicating a treatment of hyperkeratosis[2] and fissures, noting mild neuropathies[3] with filament sensation intact. After Dr. James Poulos retired in December 2003, Dr. Shannon Oates, another endocrinologist, began treating Eberle. Dr. Oates submitted a letter of medical advocacy to Prudential on October 20, 2004. In the letter, Dr. Oates states in relevant part that Eberle "has significant neuropathy in her lower extremities and cannot walk or sit for any length of time. She has had lower extremity ulcers which also present a problem and limit her ability to walk or perform any other type of physical job." (400.) Dr. Oates believed that Eberle suffered from diabetes, neuropathy, hypertension, hyperlipidemia, and depression. (Oates Dep., pp. 63-64.) Further, it was her assessment that Eberle "has significant disabilities; both physical and mental that preclude her from doing any material or substantial duties of her job." (401.)

On November 9, 2004, Prudential employee Linda Campos, RN, conducted a clinical review of the medical evidence in the file. She opined that "although [Eberle had] an extensive history of diabetes and poor control of blood sugars, there are no available

---

[2] Stedman's Medical Dictionary defines hyperkeratosis as the thickening of the horny layer of the epidermis or mucous membrane. Stedman's Medical Dictionary, 192250 (27th ed. 2000).

[3] Diabetic neuropathy is a generic term for any diabetes mellitus-related disorder of the peripheral nervous system, autonomic nervous system, and some cranial nerves. Stedman's Medical Dictionary, 272690 (27th ed. 2000).

MR indicating that this condition has impacted her functional capacity." (60.) Additionally, Campos found that Eberle was only borderline to mildly depressed, and remained active. Thus, Prudential upheld its termination of Eberle's benefits on November 9, 2004.

On March 22, 2005, Eberle again submitted correspondence appealing Prudential's decision, along with additional medical records and letters from Eberle's treating physicians. Dr. Poulos submitted a letter dated January 13, 2005, in support of Eberle.

On April 11, 2005, Prudential referred the entire claim file for an independent record review with Dr. Richard Herman. Dr. Herman made the following conclusions:

> [Plaintiff] has suffered Type 1 diabetes for 25 years. This has been poorly controlled at times. She clearly has had some hypoglycemic episodes, though she has been managing with it and able to work with it. In addition, she has not only been able to work three quarters of a job, but has maintained a full outside schedule including church activities, school board activities and involvement in her daughter's prom committee to name just a few. She has had no renal complications of her diabetes, nor did she have any visual or ophthalmological complications. She does have mild autonomic neuropathy which may cause slight gait impairment but this should not preclude her performing her occupation which is done primarily in a seated position. In addition, [Plaintiff] has had a mild depression or dysthymia. She worked with it quite well at 20 hours per week. When she was asked to go to 30, she began to have some difficulty leading a very busy life outside of work, and still maintaining a 30 hour workweek. When she was asked to go to 40 hours, she made a choice not to continue working at that job and went on a family medical leave of absence. As evidenced

by a neuropsych test, the fact that she was in
psychotherapy for only three sessions, and the fact
that her Beck Inventory Test was 15, the level of
her depression remained in the mild category. It
was certainly not severe enough to cause an
impairment which would prevent the performance of
her material duties of her own occupation. It,
therefore, appears that on 11/11/03, [Plaintiff]
had the physical and mental capacity to perform her
own job but rather made a choice to remain active
in her life outside of work rather than put all of
her energy [into] her occupation.

(140-41.) Prudential upheld its termination of Eberle's benefits
on April 21, 2005.

Eberle alleges that her claim for disability was properly
supported by objective medical evidence from Dr. Poulos, Dr. Karas,
Dr. Oates, Dr. Shook, and Dr. Oliver. In a nutshell, those doctors
testified as follows in their depositions. Dr. Poulos first
started treating Eberle in the 1970's for Type 1 diabetes. Eberle
had episodes of severe unresponsive hypoglycemia and chronic
elevation of her hemoglobin, despite an insulin pump implant. Dr.
Poulos also treated Eberle for nephropathy[4] and Dr. Poulos found
that Eberle had tortuous endoscopic vessels which is often the
first sign of retinopathy[5]. In 2003, Eberle had diabetic

---

[4] Nephropathy is any disease of the kidney. Stedman's
Medical Dictionary, 270680 (27th ed. 2000).

[5] Retinopathy is defined as a noninflammatory degenerative
disease of the retina. Stedman's Medical Dictionary, 354170
(27th ed. 2000).

ketoacidosis[6].   Dr. Poulos believed that Eberle suffered from clinically significant depression.

Dr. Karas saw Eberle on February 23, 2004, and reported that her hemoglobin was high, she had calluses on both feet, and that she had been on an ACE inhibitor since September 2003 when they started Eberle on Altace for kidney disease, or nephropathy.   Dr. Karas was concerned about Eberle's hemoglobin level.

Dr. Oates saw Eberle three times during the period of August 2004 through September 2005.   During that time period, Eberle was on an insulin pump, she had episodes of ketoacidosis, and had cracked heels from fissures.   She was taking an anti-depressant, Altace for nephropathy, and blood pressure medication.    In Dr. Oates' opinion, and based upon neuropathy testing, Eberle suffers from severe nerve damage.

The psychologist, Dr. Shook, starting treating Eberle for depression in October 2003, and saw her until April 13, 2004.   He noted that Eberle was not functioning well.

Eberle started seeing a podiatrist, Dr. Oliver, for the fissures in her heels which at times worsened to ulcers.   Dr. Oliver diagnosed Eberle with neuropathy based upon his clinical examination showing hyperkeratosis and fissuring of her skin.

---

[6] Ketoacidosis is defined as acidosis (a pathologic state characterized by an increase in the concentration of hydrogen ions in the arterial blood), as in diabetes or starvation, caused by the enhanced production of ketone bodies.   Stedman's Medical Dictionary, 4250, 217510 (27th ed. 2000).

Although the Social Security Administration initially determined that Eberle was not disabled, following an evidentiary hearing before an administrative law judge, the Social Security Administration determined that Eberle was impaired with diabetes mellitus, obesity and depression, and that her severe impairment rendered her disabled and unable to work since October 23, 2005.

<u>DISCUSSION</u>

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *NUCOR Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits," if any, that the movant believes "demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (emphasis in original) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.  In this situation, there can be "'no genuine issue as to any material fact,' since a

12

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.


Breach of Contract

First, Prudential argues that summary judgment is warranted for the breach of contract claim because Eberle failed to satisfy her burden of proof. Prudential claims Eberle did not provide objective proof of her disability, but rather only supported her claim with subjective complaints. In response, Eberle argues that Prudential is relying upon the wrong provision in the Policy in contending that Eberle had a continuing duty to provide objective medical evidence after she was initially approved for benefits and, regardless, that Eberle did support her claim with objective medical evidence.

Before the Court addresses these arguments, it must take a step back. Although both parties spend time analyzing whether Eberle carried her burden of proof of establishing disability, unfortunately, the parties do not discuss the standard of review, or the burden of proof, in a breach of contract case such as this one where the Employee Retirement Income Security Act (hereinafter "ERISA") of 1974, 29 U.S.C. § 1132 (a)(1)(B) does not govern, but long term disability benefits were denied under an employee welfare benefit program. Both sides concede that because Purdue is a

governmental entity, this matter is exempt from ERISA.  Yet almost every case cited by Prudential involves a plan governed by ERISA. ERISA authorizes a plan participant or beneficiary to bring a civil action to recover benefits due to him under the terms of the plan. The Supreme Court stated the standard of review for section 1132(a)(1)(B) claims in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).  A plan administrator's denial of benefits "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115.  A plan conferring discretionary authority to the administrator or fiduciary to make eligibility determinations is to be reviewed under an arbitrary and capricious standard, which is highly deferential.

Yet, this Court must return to the case at hand, which is not governed by ERISA.  The parties have not addressed the standard of review, but the Court sees no reason not to conduct a de novo review.  Certainly, no argument has been presented that this Court should limit itself to a review of the administrative record, nor has either party contended that Prudential only breached its contract if it reviewed Eberle's claim in an arbitrary and capricious manner.  Thus, the Court will consider the exhibits submitted by the parties in addition to the administrative record, and will conduct a de novo review.

In arguing that Eberle had the burden of proving her disability, Prudential refers to several ERISA cases. *See, e.g., Lockhart v. Jefferson Pilot Fin. Ins. Co.*, No. 03 C 1745, 2005 WL 914446, *14 n. 41 (N.D. Ill. Mar. 29, 2005) (finding Plaintiff bore the burden of proof, and citing to *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 179 (7th Cir. 1994) ("To recover benefits under § 1132(a)(1)(B), the employee must establish that she has satisfied the conditions necessary for benefits under the plan.")). Because this is not an ERISA case, the contract at issue must be analyzed to determine whether it is proper to place this initial burden of proof on Eberle.

The Policy provides in relevant part as follows:

> 2.   Proof
>
> >  a.   Proof of claim must be given to Liberty, on behalf of the Sponsor. This must be done no later than 30 days after the end of the Elimination Period.
> >
> > "Proof" means the evidence in support of a claim for benefits and includes but is not limited to (a) a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits; (b) an Attending Physician's statement completed and signed (or otherwise formally submitted by the Covered Person's Attending Physician; and (c) provision by the Attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays, **and/or other forms of objective medical evidence that may be required by Liberty in support of a claim for benefits**.

(36)(emphasis added). Plaintiff asserts that, in arguing that

15

Eberle failed to provide "objective medical evidence" to support her disability claim, Prudential erroneously relied on this provision of the Policy which relates only to the initial application process (not to Eberle's ongoing obligation to provide proof of her disability to Prudential).  Although the previously cited section is under the Policy heading "notice and proof of claim," there is nothing in the document to indicate that the word "proof" should be interpreted differently in the section entitled "notice and proof of claim" than the section referred to by Eberle, which states that "[t]he benefit will be paid for the period of Disability if the Covered Person gives to the Sponsor proof of continued: 1. Disability; 2. required Regular Attendance of a Physician; 3. Appropriate Available Treatment." (28.)  Thus, although the Policy does not specify that proof of continued disability requires objective medical evidence, when read as a whole, the contract provides that it was Eberle's burden to provide objective medical evidence in order to be awarded initial benefits, and to receive continued benefits.

So, the question is whether Eberle did indeed provide Prudential with objective medical evidence of her disability.  A claimant's subjective claim of disability need not be blindly accepted.  *See Cooke v. CNA Group Long Term Disability Ins. Plan*, No. 04 C 8289, 2006 WL 664374, *3 (N.D. Ill. Mar. 8, 2006). Based upon a careful review of the record, this Court believes

16

Eberle satisfied her burden.

First, Dr. Karas, the endocrinologist, initially submitted the signed statement to Prudential which was submitted with Eberle's claim, stating she suffered from diabetes complications, advanced neuropathies and depression. (477-79.) Thus, Prudential was provided with a clinical diagnosis. Further, Dr. Karas opined that Eberle was unable to function in a work setting. *Id.* Along with her claim and Dr. Karas' statement, Eberle submitted a lab print out. (480.) Based upon this information and a telephonic interview with Eberle, Prudential approved her disabilities.

Later, following a more in depth review of her records, Prudential terminated Eberle's disabilities. However, Eberle has pointed to objective medical evidence of her disability in the records provided to Prudential. For example, clinical review notes kept by Prudential itself indicate that Dr. Karas provided documents from a visit dated February 22, 2004, in which Dr. Karas documented calluses on both of Eberle's feet, lab results that showed an elevated hemoglobin level of 8.8 (4.7-6.4 range), an abnormal glucose level of 47 (normal 80-120), that Eberle had an insulin pump, and that she was undergoing treatment for depression. (49.) Additionally, Dr. Karas testified that Eberle's hemoglobin level was still high despite the insulin pump. (Karas Dep., pp. 37, 48.) Dr. Karas started Eberle on Altace for kidney disease, or nephropathy, in September 2003. (*Id.*, p. 42.)

17

Dr. Poulos, Eberle's long time endocrinologist, testified as to Eberle's chronically elevated hemoglobin (Poulos Dep., pp. 60-61), her neuropathy which he treated with Altace (*Id.*, p. 67), and his finding of tortuous endoscopic vessels which is often the first sign of retinopathy (*Id.*, p. 64). Eberle was hospitalized in 1989 for depression (*Id.*, p. 68), and Dr. Poulos prescribed the anti-depressant Wellbutrin.

Dr. Oates' office conducted a monofilament examination which indicated neuropathy in Eberle's feet, finding "painful paresthesias bilateral feet, decreased fine touch sensation." (Oates Dep., pp. 105-08.) Dr. Oates also testified that Eberle had severe nerve damage. (*Id.*, p. 108.)

Dr. Shook, a psychologist, saw Eberle from October 2003 through April 13, 2004. In her initial evaluation, Dr. Shook found that Eberle appeared "depressed and anxious, that she exhibit[ed] anxiety, worry, and depressed." (Shook Dep., p. 61.) Dr. Oliver, the podiatrist, treated Eberle for fissures on her heels which at times worsened to ulcers and, based upon his medical records, he believed that Eberle had neuropathies. (Oliver Dep., pp. 35-36.) He conducted tests that revealed that Eberle had decreased sharp/dull discrimination, decreased vibratory sensation, and decreased soft touch for both feet. (*Id.*, pp. 61-62.)

Much of the preceding medical evidence can be characterized as objective. For example, Eberle was prescribed several medications

for her maladies, lab tests showed her elevated levels of hemoglobin and abnormal glucose levels, and the monofilament examination revealed pain and decreased sensation in Eberle's feet. Dr. Poulos had been treating Eberle for a very long time, since the 1970's, and he documented her recurring health problems, and provided clinical diagnoses to Prudential. Also, although certainly not binding on this court, the Social Security determination "is still probative and further corroborates [Eberle's] claims." *Cooke,* 2006 WL 664374, at *4. Consequently, this Court finds that Eberle has satisfied her burden under the Policy, and provided Prudential with objective medical evidence.[7]

Although Eberle provided Prudential with objective medical evidence, the query does not end there. The ultimate question under the Policy is whether Eberle's diabetic complications render Eberle totally disabled from doing her job. This is where the real

---

[7]Prudential cites several cases for the assertion that this Court need not baldly accept the advocacy contained in the letters submitted by Eberle's physicians. *See, e.g., State Farm Fire & Cas. Co. v. Summerfield*, No. 90-1331,90-1433, 1991 WL 52659, *5 (Apr. 11, 1991) ("an expert's declaration, full of assertion but empty of facts and reasons, won't get a case past a motion for summary judgment, for the judge must look behind [the expert's] ultimate conclusion . . . and analyze the adequacy of its foundation.") (quotation omitted); *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004) ("Most of the time, physicians accept at face value what patients tell them about their symptoms; but [insurers] must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk."). However, in this case, the medications prescribed, lengthy treatments, clinical diagnoses, and medical tests, all provide some support for Eberle's physicians' advocacy letters.

disparity lies between Prudential's representatives and Eberle's doctors. Mary Ann deSantis, RN, Linda Campos, RN, and Dr. Herman all found that Eberle's disease did not prevent her from working her regular job. In contrast, Eberle's treating physicians, Dr. Poulos, Dr. Karas, Dr. Oates, and Dr. Shook, all found that she was disabled and could not work her job. Therefore, there is a genuine issue of material fact as to whether Eberle was "disabled," as defined by the Policy, which provides that a disabled person is "unable to perform all of the material and substantial duties of his or her occupation on an Active Employment basis because of an Injury or Sickness." (24.) *See Walker v. American Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999) (reversing grant of summary judgment where there was a genuine issue of material fact as to whether employee was "disabled"). The Court believes that a fact-finder could reasonably draw certain inferences about Eberle's physical ability from the evidence, but this exercise is improper for the Court to undertake on summary judgment. Because the evidence in the record could support a reasonable fact-finder's decision for Eberle, summary judgment in favor of Prudential is not warranted. *See Riedl v. General Am. Life Ins. Co.*, 248 F.3d 753, 759-60 (8th Cir. 2001) (finding factual issue as to whether employee was totally disabled precluded

summary judgment).[8]

Breach of the Duty of Good Faith and Fair Dealing

Prudential argues Eberle's claim for breach of the covenant of good faith and fair dealing fails because Eberle lacks standing to bring such a claim against Prudential.  Prudential relies heavily upon *Cain v. Griffin*, 849 N.E.2d 507 (Ind. 2006), which Eberle claims is distinguishable.

In *Cain*, the Supreme Court of Indiana held that beneficiaries under insurance policies were third party beneficiaries of the insurance contract and, as such, could sue on the contract, but were not in a fiduciary relationship.  Thus, third-party beneficiaries cannot sue in tort for breach of fiduciary duty. *Id.* at 515.  In *Cain*, the patron plaintiff visited a restaurant owned by defendants, and slipped and fell in the parking lot. *Id.* at 508.  Auto-Owners Insurance Company had issued a policy to the restaurant owners, providing insurance for the risk of any losses in connection with the premises and property. *Id.* After treatment of her injuries and unsuccessful attempts to obtain payment of her

---

[8]Alternatively, Prudential asks that even if this Court were to find a question of fact as to whether Eberle could perform her own occupation, summary judgment should be granted on the issue that the pay period should be limited to 12 months.  The Policy provides that after 12 months of payments, a claimant is disabled if Prudential determines that she is unable to perform any gainful occupation.  Because of the reasons set forth above, there is also a question of fact as to whether Eberle was able to perform any gainful occupation.

medical bills from the restaurant owners and Auto-Owners, Cain
filed a complaint against the restaurant owners and added Auto-
Owners to the suit, seeking benefit payment under the policy and
punitive damages for the bad faith denial of her claim under the
policy. *Id.* at 509. Cain argued that although she did not
contract with Auto-Owners, she was a third-party beneficiary under
the insurance agreement executed between the restaurant owners and
the insurer. The Supreme Court ruled that Cain could not proceed
on a tort claim against Auto-Owners for failure to deal in good
faith because she was merely a third-party beneficiary.

This Court is unsure whether *Cain* is dispositive here, because
Eberle seems to be more than a third party beneficiary. In *Cain*,
the plaintiff arguably had no real relationship to the insurance
contract between the restaurant and its insurer. But in this case,
the Policy itself requires Prudential to pay disability benefits to
all "Covered Persons," and Eberle qualified as a Covered Person.
(3-4, 9-14.) Moreover, Eberle paid premiums for the disability
coverage. (*See* Eberle Aff.) Thus, although Prudential arguably
entered into a contract only with Purdue, Eberle's relationship to
Prudential was much, much closer to a fiduciary relationship than
the plaintiff in *Cain*.

This Court was unable to find any case law addressing this
specific situation, where an insured under a group contract sues
the insurance company for breach of the covenant of good faith and

22

fair dealing.   But even assuming, *arguendo*, that Eberle has standing for this claim, her claim still fails.   It is well established that:

> [A] good faith dispute about the amount of a valid claim or about whether the insured has a valid claim at all will not supply the grounds for a recovery in tort for the breach of the obligation to exercise good faith.   This is so even if it is ultimately determined that the insurer breached its contract.   That insurance companies may, in good faith, dispute claims, has long been the rule in Indiana.

*Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 520 (Ind. 1993) (citing *Vernon Fire & Cas. Ins. Co. v. Sharp*, 349 N.E.2d 173, 181 (Ind. 1976)).   As the Court wrote in *Vernon Fire*:

> It is evident that the exercise of [the right to disagree as to the amount of recovery] may directly result in the intentional infliction of temporal damage, including the damage of interference with an insured's business (which an insured will undoubtedly consider to be oppressive).   The infliction of this damage has generally been regarded as privileged, and not compensable, for the simple reason that it is worth more to society than it costs, i.e., the insurer is permitted to dispute its liability in good faith because of the prohibitive social costs of a rule which would make claims nondisputable.

349 N.E.2d at 181.   Similarly, the lack of diligent investigation alone is not sufficient to support an award.   *Erie*, 622 N.E.2d at 520 (citing *Continental Cas. Co. v. Novy*, 437 N.E.2d 1338 (Ind. Ct. App. 1982)).   "On the other hand, for example, an insurer which denies liability knowing that there is no rational, principled basis for doing so has breached its duty."   *Erie*, 622 N.E.2d at 520

23

(citations omitted).

In this case, there is no evidence that Prudential knew there was no rational basis for which to deny coverage.  Rather, the veracity of Eberle's claim is simply disputed.  Additionally, the administrative record shows that Prudential underwent an extensive and thorough investigation, having 2 nurses and an independent consultant doctor review Eberle's claim and her multiple requests for reconsideration.  As the court noted in *Merrick v. Northwestern Mut. Life Ins. Co.*, No. C 99-1042 MJM, 2001 WL 34152095, *16-17 (N.D. Iowa July 5, 2001), disputes as to the accuracy of the Prudential clinical team's conclusions go to the breach of contract claim, not to the duty to deal in good faith.  For these reasons, this Court finds that summary judgment is warranted for Prudential on the claim for breach of the duty to deal in good faith.

<u>CONCLUSION</u>

For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.**  The motion is **GRANTED** as to Plaintiff's claim for breach of the covenant of good faith and fair dealing, and the Clerk is **ORDERED** to dismiss that claim **WITH PREJUDICE**.  The motion is **DENIED** as to Plaintiff's claim for breach of contract, and that claim **REMAINS PENDING**.  Plaintiff's request for oral argument is **DENIED AS MOOT**.

**DATED: February 14, 2007**          /s/ RUDY LOZANO, Judge
                                      **United States District Court**

24